FILED

DEC 2 2 2020

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | |
| OF THE UNITED STATES OF AMERICA | ) | No. 3:20-MC- 5006 |
| FOR AN ORDER AUTHORIZING THE RENEWED | ) | Varlan |
| AND INITIAL INTERCEPTION OF WIRE | ) | |
| AND ELECTRONIC COMMUNICATIONS | ) | TO BE FILED UNDER SEAL |

## **AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Steffan Hollifield, a Task Force Officer ("TFO") with United States Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a TFO with the FBI since June of 2019.  I am also a Detective with Sevier County Sheriff's office, where I have worked in law enforcement since joining the Sheriff's department in August of 2016.  I have received training in, and conducted numerous investigations into, controlled substance distribution, including cocaine, methamphetamine, and other illegal narcotics.  That experience in drug trafficking investigations includes working on wiretaps of drug trafficking organizations, traffic stops, search warrant executions, interviewing confidential sources and defendants.

3.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including cocaine and other controlled substances, I know the following:

1

a. the methods in which smugglers and drug traffickers conduct their business, including but not limited to their methods of importing and distributing drugs;

b. their use of conveyances in the conduct of their business;

c. their use of cellular telephones ("cell phones") and other cellular communication devices;

d. their use of numerical codes and code words to conduct their transactions;

e. methods of laundering drug proceeds;

f. smugglers and drug traffickers oftentimes use cell phones to communicate about their drug trafficking activities (via telephone calls and / or text messaging) and that they oftentimes use the cell phones to take photographs of their drugs, drug proceeds, and/or stash locations;

g. smugglers and drug traffickers oftentimes conceal drugs and/or drug proceeds in vehicles to avoid law enforcement detection when transporting drugs and/or drug proceeds.

## I.  Definitions

### Target Phones

4.  This application seeks the wire and electronic interception of the following:

a. A cellular telephone bearing the number 865-237-6764, International Mobile Subscriber Identity ("IMSI") 310240130838305, subscribed to by "Juan Lopez, P.O Box 15955 Lenexa, KS, 66285," and believed to be used by Juan Lopez ("LOPEZ"), which is hereinafter referred to as the "TARGET TELEPHONE 1." The TARGET TELEPHONE 1 is serviced by T-Mobile.

2

b. A cellular telephone bearing the number 754-253-6034, International Mobile Subscriber Identity ("IMSI") 310240130838304, subscribed to by "Juan Lopez, 1325 NW 5th Street, Lauderhill, Florida," and believed to be used by Juan Lopez ("LOPEZ"), which is hereinafter referred to as the "TARGET TELEPHONE 2." TARGET TELEPHONE 2 is serviced by T-Mobile.

5.      Collectively, TARGET TELEPHONE 1 and TARGET TELEPHONE 2 are hereinafter the "TARGET TELEPHONES."

## Target Subjects

6.      Juan Lopez ("LOPEZ"), Alex Martinez ("MARTINEZ"), Mario Antonio Garcia Collantes ("MARIO"), Marcos Ramirez ("RAMIREZ"), Marco Tulio Barralaga ("TULIO"), FNU LNU a/k/a "Jobani," ("JOBANI"), Nolvia Carrillo ("NOLVIA"),  Rafael Garcia ("GARCIA"), Ramon Aguirre a/k/a Chooky ("CHOOKY"), Jesus Molinares a/k/a Tarzan ("TARZAN"), Marco Cardenas ("CARDENAS"), an unknown male ("UM0289"), an unknown male ("UM5858"), and others as yet unknown, hereinafter collectively the "TARGET SUBJECTS."

## Target Interceptees[1]

7.      LOPEZ, MARTINEZ, NOLVIA, GARCIA, CHOOKY, TARZAN, CARDENAS, UM0289, UM5858, and others yet unknown, hereinafter collectively the "TARGET INTERCEPTEES."

## Target Offenses

8.      Offenses enumerated in 18 U.S.C. § 2516, that is, offenses involving violations of:

---

[1] The TARGET INTERCEPTEES are the subset of the TARGET SUBJECTS expected to be intercepted over the TARGET TELEPHONE.

a. Distribution and possession with intent to distribute controlled substances, including cocaine and marijuana, and the conspiracy to distribute and to possess with intent to distribute controlled substances, including cocaine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

b. Use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of 21 U.S.C. § 843(b);

c. Maintaining a premises for manufacture, distribution, or use of controlled substances, in violation of 21 U.S.C. § 856;

d. Conducting or attempting to conduct financial transactions with the proceeds of a specified unlawful activity with the intent to promote the specified unlawful activity or to conceal or disguise the proceeds, and the conspiracy to conduct or to attempt to conduct such financial transactions, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h); and

e. Aiding, abetting, counseling, commanding, inducing, or procuring the commission of any of the above offenses against the United States, in violation of 18 U.S.C. § 2,[2] hereinafter all collectively the "TARGET OFFENSES."

## II.  Purpose of the Affidavit

9.     This Affidavit is being submitted in support of an application for an order authorizing the the continued interception of wire communications over the TARGET TELEPHONE 1, the initial interception of electronic communications over TARGET TELEPHONE 1, and the initial interception of wire and electronic communications over TARGET TELEPHONE 2, concerning

---

[2] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense for Title III interception enumerated in 18 U.S.C. § 2516, there also is probable cause to believe that the TARGET SUBJECTS of the investigation have aided and abetted and are aiding and abetting the enumerated substantive offenses.

4

violations of the TARGET OFFENSES, for a period of thirty (30) days measured from the date the Order is entered.

10.     The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the TARGET TELEPHONES while the telephones are off the hook or otherwise in use.

11.     As a result of my personal participation in this investigation and reports made to me by other law enforcement offficers, and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this affidavit show that:

      a.     There is probable cause to believe that the TARGET SUBJECTS, and others yet unknown, have committed, are committing, and will continue to commit violations of the TARGET OFFENSES.

12.     Additionally, based upon the investigation in this case, there is probable cause to believe the following.

      a.     Particular wire and electronic communications of the TARGET INTERCEPTEES and others yet unknown, concerning the TARGET OFFENSES, will be obtained through the interception of wire and electronic communications occurring to and from the TARGET TELEPHONES; and

5

b. The communications will likely identify and provide admissible evidence concerning:

 i. The TARGET OFFENSES

 ii. The names, telephone numbers, and locations of the TARGET SUBJECTS, their associates, their drug suppliers (both domestically and potentially internationally), their workers, and other types of co-conspirators

 iii. The leadership of the drug trafficking organization ("DTO")

 iv. The dates, times, and places for commission of the illegal activities

 v. The location, receipt, administration, control, management, and disposition of the DTO's illegal narcotics, firearms, assets, and other materials

 vi. The nature, scope, places, methods of operation; and

 vii. The existence and location of records documenting the business of the DTO.

13. Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

**III. Basis of Information**

14. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a. My experience investigating crimes generally, and drug trafficking offenses specifically; as well as the experience of other law enforcement officers and agents;

b. Oral and written reports, and documents about this investigation that I have received from members of local and federal law enforcement agencies, and other law enforcement agencies and databases;

c. Physical surveillance and video surveillance conducted by law enforcement;

6

d.  Confidential sources;

e.  Public records;

f.  A review of pen register information, cellular telephone toll records, cellular telephone geolocation information, caller identification information, and cellular telephone subscriber information;

g.  Consensually recorded and documented calls and text messages;

h.  Controlled drug purchases from some of the target interceptees;

i.  Text Message Search Warrants;

j.  Geo-location search warrants;

k.  NCIC criminal history reports;

l.  Wire Interception of TARGET TELEPHONE 1.

m.  Other investigation.

15.   Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception and recording of the requested wire and electronic communications, I have not included each and every fact known to me concerning the ongoing investigation. I have presented only the facts that I believe are essential to establish probable cause for an order authorizing the interception and recording of wire and electronic communications described in this Affidavit.

## IV.   BACKGROUND ON TARGET INTERCEPTEES AND SUBJECTS

16.   Information about the TARGET INTERCEPTEES and TARGET SUBJECTS comes from the non-exhaustive list of information delineated above in the "Basis for Information" paragraph.

17.   Through review of all of this information, and based on what law enforcement knows now, the following TARGET SUBJECTS have been identified:

7

a. LOPEZ is a source of supply for cocaine and other drugs in the Eastern District of Tennessee. He is also the leader of a group of individuals distributing cocaine and other drugs in the Eastern District of Tennessee. As noted below, he organized the sale of cocaine to another individual. He has no known pending charges.

b. MARTINEZ sells cocaine in the Eastern District of Tennessee, and works directly with/for LOPEZ. MARTINEZ has sold cocaine to a confidential source on multiple occasions, and sold cocaine to CS3, as noted below, on or about December 12, 2020. MARTINEZ was previously deported in 2013, but has no known criminal convictions.

c. MARIO is a Texas based supplier of kilogram quantities of cocaine who also transports the cash proceeds from drug sales back to Texas. MARIO communicated with NOLVIA regarding the sale of multiple kilograms of cocaine in Texas to NOLVIA and JOBANI, and later supplied those kilograms of cocaine. MARIO has no listed criminal history, but money laundering charges may be pending in Louisiana. During the interception period of TARGET TELEPHONE 1, law enforcement did not intercept any communications with MARIO.

d. RAMIREZ is a Texas based supplier of kilogram quantities of cocaine. As noted below, he was twice involved in traffic stops where large amounts of cash were seized from vehicles in which he was traveling. He supervises MARIO. RAMIREZ has no criminal convictions but a money laundering charge in Texas is pending. RAMIREZ is also facing deportation proceedings. During the interception period of TARGET TELEPHONE 1 law enforcement did not intercept any communications with RAMIREZ.

8

e.      TULIO is a courier for the MARIO/RAMIREZ/LOPEZ DTO. TULIO recently lived in the Eastern District of Tennessee but was deported to Mexico after he was discovered riding in a vehicle with a large amount of cash, in a traffic stop noted below. Tulio is pending money laundering charges in Texas. He was also recently deported. During the interception period of TARGET TELEPHONE 1, law enforcement did not intercept any communications with TULIO.

f.      JOBANI is a cocaine distributor based in the Eastern District of Tennessee. He worked with NOLVIA and MARIO to arrange the sale of kilograms of cocaine in Texas and subsequent transportation of the cocaine back to the Eastern District of Tennessee. During the interception period of TARGET TELEPHONE 1, law enforcement did not intercept any communications with JOBANI.

g.      NOLVIA was caught after a traffic stop carrying a small amount of cocaine. After her stop, NOLVIA agreed to speak with law enforcement and admitted that she was involved in picking up and transporting kilograms of cocaine from Texas, purchased from MARIO, back to the Eastern District of Tennessee. NOLVIA has been previously deported and has a prior 2018 felony drug possession/sale conviction in the State of Tennessee. Felony Tennessee state drug possession charges are currently pending against NOLVIA. NOLVIA is currently in Miami and is suspected of working with LOPEZ to buy and sell cars, possibly to transport cocaine and other narcotics north into Tennessee. Law enforcement also believes that NOLVIA left the Tennessee area to avoid law enforcement and her pending charges. NOLVIA was intercepted using (832) 656-3116 to speak with TARGET TELEPHONE 1.

9

h.     GARCIA is a likely supplier for LOPEZ. As noted below, LOPEZ spoke with GARCIA about the delivery of money to pickup a new supply of illegal narcotics. GARCIA is believed to be the user of the telephone number (971) 732-3277 ("GARCIA PHONE"). Geo-location data places the GARCIA PHONE primarily in Forest Park, Georgia, near Atlanta. The GARCIA PHONE, during the interception period of TARGET TELEPHONE 1, has traveled into the Eastern District of Tennessee at least twice. Law enforcement is not aware of any pending charges on this person.

i.     CHOOKY works with and for LOPEZ. CHOOKY also appears to run or own La Carreta restaurant in the Eastern District of Tennessee. CHOOKY has been intercepted being asked by LOPEZ to do various tasks for LOPEZ, including holding cash and drugs for LOPEZ, and delivering drugs to LOPEZ's clients. Law enforcement is not aware of any prior convictions or pending charges for this person. CHOOKY is believed to be the use of telephone number 865-216-9790, which was intercepted speaking with LOPEZ over TARGET TELEPHONE 1.

j.     TARZAN works with and for LOPEZ. LOPEZ has been intercepted on multiple occasions telling TARZAN to do various tasks for LOPEZ that are believed to be drug related. Law enforcement is not aware of any prior convictions or pending charges for this person. CARDENAS is believed to be the use of telephone number 865-367-3916, which was intercepted speaking with LOPEZ over TARGET TELEPHONE 1.

k.     CARDENAS works with and for LOPEZ. CARDENAS was arrested by local law enforcement in or around September 2020 when a car that he was driving was loaded with identity theft related equipment including card readers, numerous thumb drives, and a large number of credit cards. LOPEZ and CARDENAS have been intercepted

10

speaking about driving cars back from Miami to Tennessee and law enforcement suspects that these trips are drug or drug proceed related. CARDENAS is facing state of Tennessee charges related to identity theft and the possession of card skimming devices. CARDENAS is believed to be the use of telephone number 305-298-5767, which was intercepted speaking with LOPEZ over TARGET TELEPHONE 1.

l.     The following unidentified individuals including: an unknown male ("UM0289") using telephone number (865)-315-0289; an unknown male ("UM5858"), using telephone number (407) 669-5858

### V.     Prior Applications

18.   On or about November 23, 2020, United States District Court Judge Thomas A. Varlan authorized the interception of TARGET TELEPHONE 1 for a period of 30 days,  with the following target subjects:  Juan Lopez ("LOPEZ"), Alex Martinez ("MARTINEZ"), Mario Antonio Garcia Collantes ("MARIO"), Marcos Ramirez ("RAMIREZ"), Marco Tulio Barralaga ("TULIO"), FNU LNU a/k/a "Jobani," ("JOBANI"), Nolvia Carrillo ("NOLVIA"), and others as yet unknown. Interception began on or about November 23, 2020, and remains ongoing until on or about December 22, 2020.[3]

19.   Based upon electronic surveillance (ELSUR) record checks of the DEA, ATF, Immigration Customs Enforcement (ICE), and FBI indices on or about December 18, 2020, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications to or from the TARGET TELEPHONES or of any of the TARGET SUBJECTS specified in this Affidavit.

---

[3] The affidavit for this application is fully incorporated by reference, and will be supplied to the Court for review while considering the present application at the Court's request.

## VI. FACTS ESTABLISHING PROBABLE CAUSE

20.     In this affidavit, I seek permission to initiate the interception of wire and electronic communications over the TARGET TELEPHONES.

*Background*

21.     Local law enforcement officers began an investigation into several cocaine dealers in Sevier County, Tennessee beginning in the Spring of 2020.  Since that time, law enforcement conducted a number of controlled purchases of gram amounts of cocaine from MARTINEZ.  These controlled buys occurred on or about April 30, 2020, May 12, 2020, June 8, 2020, and July 22, 2020.  During several of these controlled purchases, law enforcement recorded MARTINEZ negotiating the sales of cocaine using telephone number 865-621-8408 ("MARTINEZ PHONE").

22.     On or about July 9, 2020, LOPEZ organized the sale of 8 grams of cocaine to a confidential source, CS2.  After CS2 told law enforcement that he had negotiated the sale of cocaine by LOPEZ with LOPEZ, who was using TARGET TELEPHONE 1[4] when he was speaking with the CS2, law enforcement recorded a call from LOPEZ to CS2 in which LOPEZ arranged the meeting place for the deal to occur while using TARGET TELEPHONE 1.  Instead of LOPEZ, however, MARTINEZ arrived on scene to actually deliver the cocaine and take the cash payment for the cocaine.  MARTINEZ was then surveilled by law enforcement driving to a nearby parking lot to meet with LOPEZ, where law enforcement observed MARTINEZ hand something to LOPEZ in that parking lot.  Law enforcement believed, based on their training and experience that MARTINEZ handed LOPEZ the cash proceeds of the cocaine deal in that parking lot.

### Interceptions over TARGET TELEPHONE 1

---

[4] Toll records and a review of CS2's phone confirmed that he spoke with the TARGET TELEPHONE 1 when he was speaking with CS2.

23.    On or about November 23, 2020, law enforcement began intercepting calls to and from TARGET TELEPHONE 1 pursuant to the wiretap order noted above.

24.    On or about December 12, 2020, an unknown male ("UM0289") using telephone number (865)-315-0289, spoke with LOPEZ, who was using TARGET TELEPHONE 1.  During the call[5], the unknown male asked LOPEZ, "remembered giving him (UM0289) a couple of little balls." The unknown male then told LOPEZ, "I moved one of them and there was no problem."  But then noted that "I am moving the other one but now everyone is trying to bring the shit back to me." LOPEZ responded saying "save whatever you do not need."

25.    Based on my training and experience, and the context within this investigation, I believe that during this call the unknown male told LOPEZ that he had previously bought two eight-balls of cocaine ("if he remembered giving him a couple of little balls"), that he had sold one of the eight-balls of cocaine ("I moved one of them and there was no problem") but that customers were now bringing the cocaine back to the unknown male not happy with the quality of the product ("but now everyone is trying to bring the shit back to him.")  LOPEZ responded by essentially offering to take back the bad cocaine ("save whatever you do not need.")

26.    On or about December 12, 2020, at 7:53pm, a man ("CS3")[6] called LOPEZ, who was using TARGET TELEPHONE 1.  Their discussion, in pertinent parts, went as follows:

        CS3:      Do you have something for me?

---

[5] This call occurred in Spanish and was translated into English by a person fluent in both languages.

[6] The man described here is now a confidential source.  The confidential source was not working with law enforcement at the time of the deal described herein.  However, as noted below, after the deal, CS3 was arrested on 12/12/2020 after law enforcement caught him with cocaine and marijuana that he had just bought from LOPEZ and MARTINEZ, and agreed to work with law enforcement moving forward in order to reduce any potential sentence in the state case against him. He does not know that federal law enforcement is involved in this investigation.  CS3 has a long history of arrests that include theft, burglary of an automobile, simple possession, and at least one DUI conviction.  CS3's NCIC report is a little unclear on what offenses he was actually convicted of committing.  CS3 also consented to a review of the contents of his phone.  Based on the review of the phone contents, the intercepted communications, and law enforcement surveillance, law enforcement believes that CS3 provided truthful and reliable information on LOPEZ.

13

LOPEZ: Yes.  How much do you need?

CS3:     A quarter.

LOPEZ: It is going to be good.  Where are you?

CS3:     Headed home.

LOPEZ: Can we meet at the carwash?

CS3:     Ok.  Give me about 30 minutes because he is headed there now.

LOPEZ: Ok.

27.     Based on my training and experience, as well as the context within this investigation, I believe that during this call CS3 arranged to purchased a quarter ounce of cocaine from LOPEZ. CS3 asked LOPEZ if he had any cocaine for sale ("Do you have something for me?"), and LOPEZ responded that he did ("Yes.  How much do you need?").  CS3 then told LOPEZ he wanted a quarter ounce of cocaine ("a quarter") to which LOPEZ responded that the cocaine was good quality ("It is going to be good.").  LOPEZ and CS3 then agreed to do the deal at a carwash.

28.     Shortly after the call with CS3, at 7:56pm, LOPEZ, using TARGET TELEPHONE 1, called MARTINEZ, who was using the MARTINEZ PHONE.  LOPEZ asked MARTINEZ if he was busy.  MARTINEZ replied that he was busy. The conversation ended.  But two minutes later at 7:58pm, LOPEZ, TARGET TELEPHONE 1, called MARTINEZ again, who was again using the MARTINEZ PHONE.  The conversation went as follows:

MARTINEZ:  Tell me.

LOPEZ:      Hey, within 30 or 40 minutes go to the car wash in front of La Carreta

MARTINEZ:  Yeah.

LOPEZ:      It's the Chivo, he wants, he wants two [2] eights [8]s.

MARTINEZ:  Okay.

14

LOPEZ: Alright then, dude.[7]

29. Based on my training and experience, as well as the context within this investigation, I believe that during this call, LOPEZ asked MARTINEZ to deliver a quarter ounce of cocaine to CS3. LOPEZ told MARTINEZ to go to the carwash in front of a local restaurant, La Carreta ("within 30 or 40 minutes go to the car wash in front of La Carreta"). Then LOPEZ told MARTINEZ that "Chivo" (which means goat in Spanish) wanted two eight-balls, or a quarter ounce of cocaine ("he wants two [2] eights [8]s."). MARTINEZ agreed to deliver the cocaine to "Chivo" saying, "Okay."

30. At 8:32pm LOPEZ, using TARGET TELEPHONE 1, and MARTINEZ, using the MARTINEZ PHONE spoke again. This time, LOPEZ told MARTINEZ that the deal would not happen at the carwash but rather at another location, "No, meet him at Wears Valley [PH]. Hold on. Meet him at the Wears [PH], at the third light, at the gas station there, at the Wears Valley [PH], at the third light."

31. I believe, based on my training and experience, as well as the context within this investigation, that during this conversation, LOPEZ was directing MARTINEZ to change the meeting location for the planned cocaine deal with CS3 from a carwash to another location, a nearby location known as Wears Valley.

32. Law enforcement was able to surveil the planned cocaine sale arranged between CS3 and MARTINEZ in the Eastern District of Tennessee. MARTINEZ arrived at the location at approximately 9:15pm. Law enforcement officers were able to see MARTINEZ get in a vehicle with CS3, where they were observed speaking for several minutes. Another unknown individual got out of the car that MARTINEZ had driven to the scene and got into the back seat of CS3's

---

[7] This call occurred in Spanish and was translated into English by a person fluent in both languages

vehicle. The parties lingered in the area for a moment, and then parted ways in two separate vehicles.

33. CS3, who was not cooperating with law enforcement at the time, and whose identity was not known to law enforcement at the time, was then stopped by local law enforcement driving away from the scene at approximately 9:45pm. In a lawful search of CS3's person and vehicle, law enforcement discovered approximately 4 grams of a white powdery substance that is believed to be cocaine and approximately 2 pounds of a green leafy substance believed to be marijuana. CS3 agreed to speak with law enforcement and told law enforcement that he had purchased the cocaine from LOPEZ, and that he had been buying cocaine from LOPEZ for approximately 2 years. CS3 also stated that LOPEZ had given him marijuana found in CS3's vehicle. CS3 told law enforcement that when he negotiated the sale of drugs with LOPEZ, LOPEZ would send various runners to actually deliver the ordered drugs to CS3.

34. According to pen register data on TARGET TELEPHONE 1, from approximately 10:38pm until 10:47pm, MARTINEZ, using the MARTINEZ PHONE, and LOPEZ, using TARGET TELEPHONE 1, exchanged 9 text messages. Based on my training and experience, as well as the timing of the messages, I believe that these messages were regarding the completion of the sale of cocaine planned by LOPEZ, and executed by MARTINEZ, with CS3, just approximately one hour prior to the text messages occurring.

35. In summary, from the time that CS3 and LOPEZ agreed that LOPEZ would sell a quarter ounce of cocaine to CS3, until approximately one hour after the deal was completed, LOPEZ and MARTINEZ exchanged two phone calls and 9 text messages. The following is a summary of the communications between TARGET TELEPHONE 1 and the MARTINEZ PHONE that evening.

- 7:56pm (call)

16

- 8:32pm (call)

- 10:38pm (text)

- 10:39pm (text)

- 10:44pm (text)

- 10:45pm (text)

- 10:45pm (text)

- 10:46pm (text)

- 10:46pm (text)

- 10:47pm (text)

- 10:47pm (text)

36.    On or about December 15, 2020, an unknown male ("UM5858"), using telephone number (407) 669-5858 called LOPEZ, who was using TARGET TELEPHONE 1. During the call, in pertinent parts, UM told LOPEZ, "if I go to Knoxville, if you can not get good weed, then I do not want the weed anymore." LOPEZ said "okay." UM5858 told LOPEZ "I can not move that because that is cocaine. If it is not good weed to smoke, then no one is going to buy it, cocaine if it's good because I'm going to the zoo, I knows that because I made 1,000."[8] During this call, UM5858 specifically referenced cocaine and weed.

37.    Based on my training and experience, as well as the context within this investigation, I believe that during this call UM5858 complained to LOPEZ that the weed he previously bought from LOPEZ was not good weed ("if I go to Knoxville, if you can not get good weed, then I do not want the weed anymore."). UM5858 also stated that he profits more readily by selling cocaine ("cocaine if it's good because I'm going to the zoo, I knows that because I made 1,000.").

---

[8] This call occurred in Spanish and was translated into English by a person fluent in both languages.

## TARGET TELEPHONE 2

38.   Early on in this investigation, law enforcement suspected that LOPEZ was using another phone in addition to TARGET TELEPHONE 2. When NOLVIA's phone was searched, and as discussed in more detail below, TARGET TELEPHONE 1 and TARGET TELEPHONE 2 both appeared under the name Carreta in NOLVIA's phone. As noted above, both TARGET TELEPHONE 1 and TARGET TELEPHONE 2 are subscribed to "Juan Lopez." The subscriber addresses, however, are different. TARGET TELEPHONE 2 is subscribed to an address in South Florida, a place that law enforcement knows LOPEZ has recently traveled to almost every week, based on intercepted communications over TARGET TELEPHONE 1, and prospective geo-location data on TARGET TELEPHONE 1.

39.   Furthermore, NOLVIA was arrested by local law enforcement on or about August 18, 2020 and found in the possession of approximately 2 grams of cocaine.  NOLVIA agreed to allow law enforcement to search her phone. TARGET TELEPHONE 1 was listed in NOLVIA's phone contacts as "Juan Carreta."  TARGET TELEPHONE 2 was listed in NOLVIA's phone contacts as "Carreta n. 2."  Based on this information, law enforcement believes that NOLVIA had two contact numbers for LOPEZ, TARGET TELEPHONE 1 ("Juan Carreta") and TARGET TELEPHONE 2 ("Carreta n. 2").

40.   Based on my training and experience, I am aware that drug traffickers frequently carry multiple cellphones as a part of their drug trafficking business. This is done to minimize the ability of law enforcement to intercept their communications with various components of their DTO, but also to keep one device for use with particular aspects of their business, such as for customers, while the other phone is used for personal matters or suppliers.

18

41.    Law enforcement obtained a federal warrant to receive prospective geo-location information on TARGET TELEPHONE 1 on or about November 20, 2020. Law enforcement also received a federal warrant to receive prospective geo-location information on TARGET TELEPHONE 2 on or about November 29, 2020. From approximately December 3, 2020 until the present, I have reviewed the geo-location data from both TARGET TELEPHONES. I know that the geo-location information between those two phones appears to match and demonstrates that the user of TARGET TELEPHONE 1 is also the user of TARGET TELEPHONE 2. When TARGET TELEPHONE 1 moves, so does TARGET TELEPHONE 2, and to the same general locations (the precision of the location varies from very precise to not very precise, and does not always perfectly align when the location data is not very precise). And when wire intercepts and geo-location data showed LOPEZ and TARGET TELEPHONE 1 was in Miami, not in Tennessee, geo-location data on TARGET TELEPHONE 2, also showed that the user of that phone was in Miami. Both TARGET TELEPHONES show that when LOPEZ is in Tennessee, the TARGET TELEPHONES location information clusters around a trailer that LOPEZ is known to sleep in when he is in Tennessee. I am not aware of any times when the TARGET TELEPHONES showed locations that would suggest another person, other than LOPEZ, was carrying TARGET TELEPHONE 2.

42.    For example, on December 10, 2020 both phones simultaneously showed that they were both located at or near the LOPEZ HOUSE in EDTN. In another example, on December 12,2020, both phones showed that LOPEZ arrived in Miami. Moreover, on December 18, 2020, the geo-location information for both TARGET TELEPHONES traveled together along the interstate highway I-95 from Florida toward Tennessee when wire intercepts indicated that LOPEZ was traveling from Florida to Tennessee that same day, and law enforcement observed LOPEZ arrive back in Sevierville that afternoon.

19

43.    In summary, based on all the available evidence, law enforcement believes that TARGET

TELEPHONE 2 is also being used by LOPEZ.

## VII.   ANALYIS OF TELEPHONE RECORDS

<u>TARGET TELEPHONE 1</u>

44.    On October 22, 2020, United States Magistrate Judge Debra Poplin authorized a pen/trap

and trace device on TARGET TELEPHONE 1 which began collecting data on October 29, 2020

and is still currently active. Pursuant to subpoenas, law enforcement obtained toll records for

TARGET TELEPHONE 1 from March 1, 2020 to October 28, 2020. Thus, law enforcement

possesses call and text message history for TARGET TELEPHONE 1 from March 1, 2020 to

December 16, 2020, which is "the covered period."

45.    During the covered period, records show that 19,422 calls and 1,053 text messages were

placed to and from TARGET TELEPHONE 1. The most recent call and text message was on

December 16, 2020.

46.    During the covered period, 506 calls and 11 text messages occurred between MARTINEZ

PHONE and TARGET TELEPHONE 1.  The most recent call and text message occurred on

December 12, 2020.

## **<u>TARGET TELEPHONE 2</u>**

47.    On November 27, 2020, United States Magistrate Judge Debra Poplin authorized a pen/trap

and trace device on 754-253-6034 TARGET TELEPHONE 2, which began collecting data on

December 03, 2020, and is still currently active. Pursuant to subpoenas, law enforcement obtained

toll records for TARGET TELEPHONE 2 from July 11, 2020 to September 28, 2020 and October

01, 2020 to November 24, 2020. Thus, law enforcement possesses call and text message history

for TARGET TELEPHONE 2 from July 11, 2020 to December 16, 2020, with the exception of

20

September 28 until October 1, 2020, and November 24 until December 3, 2020, which is "the covered period."

48.    During the covered period, records show that 6,876 calls and 2,927 text messages were placed to and from TARGET TELEPHONE 2. The most recent call and text message was on December 16, 2020.

49.    During the covered period, records show that 865 calls and 235 text messages occurred between MARTINEZ PHONE and TARGET TELEPHONE 2. The most recent call occurred on December 13, 2020 and the most recent text message occurred on December 09, 2020.

## VII.  Need For Interception

50.    Based on my training and experience, the experience of other law enforcement officers involved in this investigation, and all the facts set forth herein, it is my belief interception of wire and electronic communications over the TARGET TELEPHONES is the only available investigative technique that has a reasonable likelihood of achieving the goals of this investigation, which include:

    a.  The dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers.

    b.  Identification of all significant contributors to the DTO.

    c.  Collection of evidence sufficient to prosecute all significant contributors to the DTO.

    d.  Seizure of narcotic shipments before they reach users.

    e.  Identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO.

21

f.  Collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators.

g.  Collection of evidence sufficient to prosecute and seize proceeds of the DTO's drug transactions, bulk cash smuggling efforts and/or money laundering efforts.

51.     Based on my training and experience, it is my belief that the interception of wire and electronic communications, in conjunction with the other investigative techniques currently being used in this investigation, is the only available technique that has a reasonable likelihood of identifying the entirety of the DTO, to include all sources of supply who are believed to be based in or near Florida, Texas, and in Mexico. It is my belief that the interception of wire and electronic communications, as detailed herein, is the only available technique with a reasonable likelihood of securing the evidence sought, which is necessary to prove beyond a reasonable doubt the participation of all of the co-conspirators involved in the DTO, to identify all co-conspirators, and to identify the sources of supply. Numerous investigative procedures typically employed in an investigation of this type have been tried and have failed, reasonably appear to be unlikely to succeed if they tried, or are too dangerous to employ.

**TARGET TELEPHONE 2**

52.     During the interception of TARGET TELEPHONE 1, it quickly became apparent that all of LOPEZ's communications were not being intercepted over TARGET TELEPHONE 1. For example, on or about November 29, 2020, law enforcement surveillance on LOPEZ spotted LOPEZ using a telephone but the call was not intercepted over TARGET TELEPHONE 1 or the pen register on TARGET TELEPHONE 1. Moreover, pen register data and toll data from TARGET TELEPHONE 2 demonstrates that LOPEZ is using TARGET TELEPHONE 2 to talk to MARTINEZ, NOLVIA, and others who are suspected of working LOPEZ to buy and sell

22

cocaine and other illegal narcotics. Moreover, based on the volume of calls on TARGET TELEPHONE 1, versus the volume of calls on TARGET TELEPHONE 2, it is apparent that LOPEZ uses TARGET TELEPHONE 2 more frequently. In order to fully accomplish the goals of this investigation, law enforcement requires a full picture of LOPEZ's communications, not simply a percentage of his communications over TARGET TELEPHONE 1. For example, law enforcement is still working to identify the full scope of the LOPEZ DTO, its customer base, the DTO's sources of supply, to acquire evidence sufficient to prosecute members of the LOPEZ DTO, and to acquire evidence sufficient to prosecute suppliers of the LOPEZ DTO. As such, law enforcement believes that the interception of TARGET TELEPHONE 2, in addition to TARGET TELEPHONE 1, is needed as the investigation seeks to fully accomplish the goals of the investigation.

### Counter Surveillance

53.     Important for several sections below, LOPEZ and other members of the DTO use counter-surveillance techniques.  For instance, we know that LOPEZ frequently changes the car that he is driving.  Law enforcement observed through electronic and physical surveillance that LOPEZ left the Eastern District of Tennessee on multiple occasions in the past few months to travel to other areas such as Florida and Texas. When LOPEZ has been observed back in the Eastern District of Tennessee, he was spotted driving new vehicle after his return that are registered to him.  Shortly after arriving back into the district, LOPEZ has then been spotted meeting with a local county employee in order to change the tags and registration on the new vehicles to someone else's name, even though LOPEZ has been spotted continuing to drive the new vehicle. Furthermore LOPEZ has a Whatsapp account, which is an end-to-end encryption application on smart phones that can be used to have secure conversations about innocent or illegal activity. Based on my training and

experience, I know that drug traffickers frequently use end-to-end encryption to mask their conversations from potential law enforcement surveillance. Moreover, for the July 9, 2020 sale of cocaine, and the December 12, 2020 sale of cocaine, described above, LOPEZ was careful not to conduct the transaction himself, but rather to send "runners" or "couriers" to drop off the drugs and bring the proceeds to him in a separate location. Based on my training and experience, this sort of behavior is designed to minimize any risk that LOPEZ himself could be caught up in any law enforcement activity surrounding a drug deal. I know that drug trafficking organization leaders frequently do not handle the sales of drugs themselves in order to reduce the chance that they themselves are caught selling drugs.

54.     MARIO has used at least 4 different telephone numbers since approximately August of 2020. For example, MARIO appears to have changed phone numbers after law enforcement activity in this case, including traffic stops in Louisiana and Texas, which are described above, and NOLVIA speaking with law enforcement. MARIO is also known to use Whatsapp.

55.     On or about November 10, 2020, when law enforcement drove by a residence believed to be used by RAMIREZ, law enforcement observed as many as 10 or more surveillance cameras covering the exterior of the residence, making any potential surveillance or law enforcement action risky at that residence.

56.     Wire intercepts over TARGET TELEPHONE 1 revealed that LOPEZ frequently avoids locations where he spots law enforcement vehicles. For example, on several occasions wire intercepts captured LOPEZ stating that he was avoiding, or urging others to avoid, areas where he spotted law enforcement.

<div align="center">

### Surveillance (Vehicle Trackers, Geolocation Information, Physical Surveillance, and Pole Cameras)

</div>

57.     Agents have traveled to Texas and Florida to attempt surveillance in this case, and have

conducted a large amount of surveillance in the Eastern District of Tennessee. While surveillance has been useful in accomplishing the goals of this investigation, surveillance alone cannot accomplish the goals of this investigation. For example, in this case, law enforcement has surveilled LOPEZ, MARTINEZ, and other members of the DTO. Law enforcement, on multiple occasions also attempted surveillance on possible locations used by MARIO. But law enforcement cannot discern the whole scope of the drug trafficking conspiracy, the weights and types of narcotics bought and sold, the full identities of potential co-conspirators, the roles of potential co-conspirators, sources of supply, or obtain evidence necessary to secure prosecutions for involved co-conspirators based on surveillance alone.

58.　　In another example, law enforcement observed LOPEZ traveling outside the district using license plate readers and other physical surveillance on multiple occasions since August of 2020, but has not been able to learn where he was headed or why he was traveling based on this surveillance alone. While law enforcement suspects that these trips are related to the purchase of narcotics or the laundering of narcotics proceeds, surveillance alone cannot reveal the nature and purpose of these trips without a wiretap. On or about November 10, 2020, federal agents traveled to Dallas, Texas in an attempt to surveil possible locations used by MARIO[9], but were unable to spot MARIO, and were only able to take vehicle tag information on possible locations used by MARIO. This trip demonstrates the difficulty of using surveillance alone to conduct a drug trafficking investigation.

59.　　In another example, during the interception period, on or about December 9, 2020, when geo-location data on a phone used by GARCIA indicated that he drove into the Eastern District of

_____

[9] Location data, open source records, and law enforcement databases gave law enforcement several locations to search for MARIO.

Tennessee, law enforcement mobilized to attempt to find GARCIA based on geo-location data on the suspected supplier's phone. But because of the imprecision of the geo-location data, law enforcement was not able to find GARCIA, learn who he met with, or what his business was in Tennessee. We know, through pentrap data and wire interceptions over TARGET TELEPHONE 1 that GARCIA speaks with LOPEZ over TARGET TELEPHONE 1.

60.     On or about December 2-4, 2020, law enforcement traveled to Miami to surveil a house that geo-location data demonstrated was where LOPEZ was staying in Miami. Law enforcement was only able to observe vehicles parked in the driveway of that residence, and attempted to follow LOPEZ driving around in Miami, but lost him due to high vehicle traffic in the area.

61.     In another example during the interception period, on or about December 8, 2020, law enforcement surveilled LOPEZ as he drove north from Florida into the Eastern District of Tennessee. Law enforcement was able to spot LOPEZ stopping in hotel parking lot in the Northern District of Georgia, along with several other persons and vehicles that appeared to be traveling with LOPEZ. When LOPEZ left the parking lot and headed back to Tennessee, LOPEZ and his fellow travelers left one car behind in the hotel parking lot. Later that same day, after someone retrieved that car and headed north into the state the Tennessee, law enforcement stopped that vehicle. The car was driven by a female. A dog alerted on the car, and a small amount of suspected marijuana, and credit card skimming equipment were found in the vehicle. While law enforcement attempted to interview the female driver, the driver did not give law enforcement any significant information that advanced the investigation. This stop was not helpful in achieving the goals of the investigation.

62.     As discussed above, law enforcement surveilled a meeting between MARTINEZ and CS3, on or about December 12, 2020. Law enforcement observed a deal where MARTINEZ

delivered marijuana and approximately 4 grams of suspected cocaine to CS3. While this physical surveillance has been somewhat helpful to the investigation, it has not accomplished, and cannot accomplish the goals of this investigation by itself.

63.     The use of vehicle-tracking devices also has been contemplated in this investigation. On one occasion, law enforcement obtained a federal warrant for a vehicle driven by LOPEZ. As noted below, there are many risks associated with this technique and placing the tracker in this was difficult and dangerous and will not likely be attempted again in this case. On or about November 30, 2020, law enforcement placed the tracker device on a vehicle driven by LOPEZ but learned very little from the tracker before the tracker fell off the vehicle. I believe any future attempt to install a vehicle tracking device carries a significant risk of detection by the DTO, as law enforcement had a difficult time placing the tracker on the vehicle without being spotted. Home/private use surveillance cameras are now common-place and they often have night vision capability, the ability to detect movement, record, and alert the user via mobile devices. Even if a vehicle-tracking device is successfully installed on vehicles associated with the DTO, there is no reason to believe that the movements of the vehicle would allow agents to determine who is supplying naroctics or moving money on behalf of the DTO. Despite these risks, prior to the wiretap commencing, local law enforcement placed trackers on two vehicles believed to be driven by LOPEZ. As noted above, LOPEZ frequently changes the vehicles that he drives and these attempts to track LOPEZ's movements through vehicle-trackers has not produced information sufficient to accomplish the goals of this investigation, despite the risky nature of placing these trackers. For example, one vehicle tracked by law enforcement was later found abandoned. As such, while law enforcement has seriously considered further use of vehicle trackers, but at this time, law enforcement believes that the potential investigative benefits of the use of these trackers

is minimal and is outweighed by the potential for discovery or dangerous encounters while placing the trackers. For the reasons described above, I believe any further efforts to place a tracker on this vehicle could be dangerous, reveal our investigation, and would yield little new critical information.

64.    Law enforcement is using geo-location phone tracking extensively in this investigation. For example, law enforcement sought federal search warrants for the geo-location of phones used by MARIO on three occasions since August of 2020. Law enforcement attempted, through a federal search warrant, to locate MARIO PHONE 1, but MARIO dropped this phone before it could be located.  Law enforcement then attempted, through another federal search warrant, to locate another phone (MARIO PHONE 3) believed to be used by MARIO, but that phone too had been turned off or dropped by MARIO and yielded no geo-location information.  Finally, law enforcement, through a third federal search warrant, obtained geo-location information on MARIO PHONE 4, believed to be used by MARIO, and this information was used to locate MARIO in the general area of Dallas, Texas, and the surrounding areas.  However, the "pings" from this federal search warrant are not especially accurate, with an accuracy that is often approximately limited to a 500 – 3000 meter range. This limitation on geo-location information obtained from MARIO PHONE 4 means that law enforcement cannot accomplish the goals of this investigation through the use of this information alone. Indeed, at those low accuracy levels, it is hard for law enforcement to even find where MARIO is actually located beyond a generalized area. This is true also for historical cell-site data, which only tells law enforcement what tower and tower face was used by a cellphone at a historical point in time.  Law enforcement obtained this data for MARIO PHONE 4, but this information has been useful mainly to place MARIO in a general area historically.

28

65.     During this investigation, law enforcement has also obtained geo-location information on several phones used by suspects, including the TARGET TELEPHONES, as well as the MARTINEZ PHONE and a phone used by GARCIA.  While this information has been helpful, I do not believe that this information, alone can accomplish the goals of this investigation. For example, while this information is useful, law enforcement cannot determine what MARIO or LOPEZ are doing in identified locations, who they are meeting with, why they traveled to the locations in question, or with whom they are meeting or working with at the time.  Agents also don't learn the breadth of the DTO, who the key players are, or the manner and means by which they control the flow of drugs and money from this sort of surveillance. There are also serious limitations to GPS phone tracking. If phones are turned off or frequently dropped, agents often have no ability to track MARIO, LOPEZ, MARTINEZ, or other members of the DTO.  Geo-location information often has limited precision.  In this case, geo-location data has varied from relatively precise information showing a location within tens of meters, but also has been very imprecise, showing a location within hundreds of meters.  When imprecise, location information is very limited in its utility.   Thus, while geo-location trackers are helpful, they have real limitations and do not accomplish the goals of this investigation on their own. As noted above, when GARCIA was tracked into the Eastern District of Tennessee, law enforcement was unable to even find GARCIA because the geo-location data was so imprecise at that time.

66.     Law enforcement has used a pole camera on a trailer ("LOPEZ HOUSE") used by LOPEZ and other members of the DTO. This pole camera has yielded some important information, including when cars and individuals arrive at the LOPEZ HOUSE. LOPEZ, MARTINEZ, and NOLVIA have been spotted at the LOPEZ HOUSE. When the pole camera is monitored, law enforcement can usually discern if a known person enters or exits the property, and can often read

29

a license plate on vehicles entering or exiting the property. But this information alone cannot accomplish the goals of this investigation. For example, the pole camera does not reveal why a person or vehicle is at the LOPEZ HOUSE, or what is occurring inside the property, overhear conversations on or in the property, or what was carried to and from the property. Nor can the pole camera identify the roles of any potential co-conspirators, the weights or types of narcotics being bought and/or sold, or identify the DTO's sources of supply. There are also significant risks associated with the use of pole cameras. In one recent investigation, I am aware that the pole camera was spotted, and a photograph of the pole camera was placed on social media.

67.    In summary, while surveillance has been seriously considered and repeatedly attempted, surveillance alone cannot accomplish the goals of this investigation where the target DTO is using cellphones to conduct its business.

## Confidential Sources

68.    This investigation has heavily used confidential sources in an effort to penetrate the DTO. As noted above, CS1 and CS2 were used to purchase narcotics from MARTINEZ and LOPEZ. But these confidential sources have not had access to the inner workings of the DTO, and they do not know the identities of any sources of supply, or the full breadth of the DTO's activities. Based on the information provided by these confidential sources, they are not able to learn or otherwise get access to information such as the full scope of the DTO's activities, their sources of supply, the weights of narcotics bought and sold by the DTO, or the identities of all of the DTO's co-conspirators. The leadership structure of this DTO appears, as noted above, to isolate itself from hand-to-hand drug sales, which in my training and experience is not uncommon. Furthermore, the confidential sources can only buy from lower level members of the DTO, and LOPEZ has stopped communicating with at least one of the confidential sources, CS2. CS1 does not have access to

LOPEZ or other members of the DTO's leadership. NOLVIA has served as a source of information in this case. NOLVIA gave an extensive interview with law enforcement in which she detailed her interactions with MARIO and other members of the DTO. NOLVIA also permitted law enforcement to search her phone. This information was extremely useful in this investigation but also had many limitations. One such limitation is that NOLVIA did not know the identity of MARIO, nor did she have pictures of MARIO. Based on toll records, and pen/trap data, NOLVIA is not believed to be still be in communication with MARIO, and may have been cut off by other members of the DTO as well. For example, LOPEZ drove NOLVIA to a follow-up interview with law enforcement in or around October of 2020. NOLVIA has also not provided any information on LOPEZ, possibly because LOPEZ and she have a professional and/or personal relationship based on information developed by law enforcement, including surveillance and toll records. As such, while the use of confidential sources and the interview with NOLVIA in this case has been helpful to accomplishing the goals of this investigation, the use of confidential sources and information provided by NOLVIA alone cannot fully accomplish the goals of this investigation.

69.     On or about December 12, 2020, law enforcement interviewed CS3, who provided useful information about LOPEZ and other members of the DTO. But CS3 did not even know who MARTINEZ was, and also had limited information about LOPEZ's sources of supply, the breadth of his operations, and was limited to a buyer/seller relationship with LOPEZ in the past and present. Therefore, while the use of confidential sources has been helpful, it is not a technique that alone can accomplish the goals of this investigation.

70.     Interviews of subjects and their associates have been limited to persons already arrested or persons who have sought to cooperate with law enforcement in this investigation. Those persons have been identified in the wiretap application affidavits as CS1, CS2, CS3, and NOLVIA. Based

on my experience and the experience of other agents in conducting investigations of persons involved in drug trafficking, it is my belief that if interviews were attempted of people not arrested, the individuals contacted would alert their co-conspirators of federal law enforcement interest in their activities, causing them to flee or resulting in the possible concealment, movement, or destruction of documents, drugs, cash, and/or other evidence, which would make it more difficult for sufficient evidence to be obtained to identify and prosecute them. As such, while law enforcement has seriously considered further interviews of individuals involved in this investigation, law enforcement believes that the risks of this technique outweigh the potential benefits, and cannot, by itself, accomplish the goals of this investigation.

### Undercover Agents

71.     Based on my training and experience, as well as this investigation, I do not believe that an undercover law enforcement agent could penetrate this DTO or fully accomplish the goals of this investigation. This DTO appears to work primarily with other Hispanic males and females they have established relationships with, over the course of many months or years, and as such, I do not believe that an undercover agent could acquire meaningful access into the DTO. By its very nature, the use of an undercover law enforcement officer is extremely dangerous, and if the undercover officer is discovered, serious harm could befall that officer. I believe that any undercover officer would be regarded as highly suspicious and unlikely to learn any information from LOPEZ, MARIO, or other members of the DTO. Even if an undercover agent could potentially make a buy from the DTO of a few grams of cocaine or another drug, such a buy would yield little new information about the DTO, and fall far short of accomplishing the goals of this investigation. As such, I believe that the risks of using an undercover agent far outweigh any potential benefit, and cannot, by itself accomplish the goals of this investigation.

Case 3:20-mc-05006-TAV   Document 2   Filed 12/23/20   Page 32 of 49   PageID #: 48

## Consensual Monitoring

72.      NOLVIA allowed law enforcement to look through her phone and messages. But NOLVIA

appears to be loyal to LOPEZ, as she has not mentioned him, and LOPEZ drove NOLVIA to a

meeting with law enforcement. As such, law enforcement is extremely worried that any questions

about LOPEZ or an effort to use NOLVIA to investigate LOPEZ would lead to NOLVIA alerting

LOPEZ that there is a federal investigation into him. As noted elsewhere, NOLVIA is not believed

to still be in contact with MARIO.

73.      CS1 and CS2 consented to the monitoring of their calls before low-level drug purchase

deals with members of the DTO. CS3 has agreed to work with law enforcement in the future, but

his ability to buy from or speak with LOPEZ may be limited because of his arrest. Law

enforcement is not sure what further information he will be able to provide, but CS3 is not a

member of the LOPEZ distribution DTO and thus his utility is limited. The information gleaned

from NOLVIA and the confidential sources did not accomplish the goals of this investigation,

identify the DTO's sources of supply, methods of laundering proceeds, the leadership structure of

the DTO, or identify all members of the drug trafficking conspiracy. Furthermore, there is the risk

that any cooperator may, at any time, alert LOPEZ or MARIO of law enforcement's interest in

their operations, and permit them to destroy evidence, alter his operations, and thwart this

investigations goals. As such, while the use of the consensually recorded calls has been useful, it

has not, and cannot fully accomplish the goals of this investigation.

## Trash Pulls

74.  An investigative technique that sometimes provides useful evidence is a "trash pull" or the

collection and examination of discarded trash at a subject's business and/or residence. Law

enforcement attempted a trash pull on August 17, 2020, from an address where MARTINEZ was

spotted by law enforcement surveillance. This trash pull did not yield any useful information or evidence. Law enforcement has considered a trash pull on the LOPEZ HOUSE, but the LOPEZ HOUSE is a trailer in a crowded trailer park, that utilizes a community trash bin. As such, it would be difficult or impossible to isolate trash from the LOPEZ HOUSE from the trash from other trailers in the area. There is also a significant risk that law enforcement agents digging through the community trash in a crowded trailer park would be identified and the investigation jeopardized by the use of this technique. Based on my training and experience, even when law enforcement can pull trash from a suspicious address, the information and evidence yielded is not sufficient to fully accomplish the goals of this investigation. For example, trash pulls might be expected to yield discarded mail, notes, or drug wrappings. Trash pulls are unlikely to fully identify co-conspirators, the methods a DTO uses to operate, or the DTO's sources of supply. Law enforcement has been unable to identify, with any certainty, locations from which MARIO operates, as such, cannot attempt a trash pull at this time. A trash pull has been considered at a home believed to be used by RAMIREZ, but that home appears to be heavily monitored by cameras. A trash pull is being contemplated at a home in the Miami area believed to be used by LOPEZ and NOLVIA, but has not been attempted at this time, in part because the risk/reward calculous militates strongly against such a risky maneuver with low potential yield at this time.

## Mail Covers

75.     Mail covers are a service provided by the United States Postal Service (USPS), wherein a list of all sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location and then a list would be provided to the United States Postal Inspector who would provide the list to agents. Based on present information, the DTO transports drugs and

34

money in vehicles and not the mail. Therefore, agents do not believe that mail covers would be beneficial in identifying DTO co-conspirators or sources of supply of other illegal drugs. As such, while law enforcement has seriously considered the use of mail covers, I believe that in this investigation, a mail cover would yield little information, by itself, or otherwise fully accomplish the goals of this investigation.

## Grand Jury Subpoenas

76.    Based on my experience, training, and conversations with Assistant United States Attorney Kevin Quencer, who has considerable experience prosecuting the federal drug laws, I believe that subpoenaing persons suspected of being involved in this conspiracy, or their associates, would be unsuccessful in achieving the stated goals for this investigation. Many of the conspirators are not fully identified.  Furthermore, conspirators brought before the grand jury would most likely invoke their Constitutional rights against self-incrimination and to the existence of the investigation. This would cause the targets to become more cautious in their activities, flee to avoid further investigation or prosecution, or threaten the lives of confidential sources or others falsely suspected of cooperating.

77.    Law enforcement has sent several subpoenas for bank records for LOPEZ and others and are awaiting returns. But this information alone, once known, cannot fully accomplish the goals of this investigation. Based on my training and experience, Mexico supplied drug trafficking organizations such as this one, primarily use bulk-cash smuggling to transport proceeds back to border areas, and do not use the formal banking system for their laundering efforts. This has born out in this case, where two seizures of cash proceeds from vehicles with passengers tied to this DTO were seized, as noted in the incorporated affidavit, in Louisiana and Texas. As such, while bank records and other financial information obtainable through grand jury subpoenas may

ultimately be useful in this investigation, I believe that these techniques, cannot alone fully accomplish the goals of this investigation.

78.    Agents have also utilized dozens of administrative subpoenas to learn the subscriber information of telephones involved in this investigation, included the TARGET TELEPHONES, and phones used by MARIO, LOPEZ, MARTINEZ, GARCIA, and other co-conspirators, as well as toll records for phones suspected of involvement in this DTO. These phone records, while useful to understand the communication patterns of the members of the DTO cannot fully accomplish the goals of this investigation. For example, tolls records do not identity the users of the various telephone contacts, detail the nature of the communications, provide evidence sufficient for prosecution, or otherwise accomplish the goals of this investigation. Various members of this DTO appear to have registered telephones that they use in fictional names or the names of other persons not involved in the DTO, and this comports with my training and experience. As such, I do not believe that the use of subpoenas in this case can fully accomplish the goals of this investigation.

### Subject Interviews

79.    Based on my experience and the experience of other agents and officers working on this investigation, I do not believe further interviews of subjects or their known associates would produce sufficient information about the DTO, including the source of drugs, the financing of drug purchases, and the transshipment of cocaine and other drugs into our district or around the United States at this time. I know through being involved in other drug investigations that, when confronted, subjects minimize their own involvement and protect others. Most concerning, the interviewed subjects would likely alert other DTO members, thereby compromising the investigation and resulting in the possible destruction or concealment of evidence or potentially placing cooperators in danger.

36

80.	As a general matter, it would be unwise to risk jeopardizing this investigation based on the unpredictable actions of co-conspirators. The risks associated with confronting co-conspirators about the DTO far outweigh the possible benefits. There is no way for law enforcement to know if the person approached will fully cooperate, or refuse to cooperate at all. Even if the individual agrees to be interviewed, there is no way to ensure that the information will be truthful or accurate. The individual could very well alert other DTO members, which could severely harm the investigation.

### Search Warrants

81.	Law enforcement has already executed a series of search warrants for geo-location information on various phones used by MARIO, LOPEZ, MARTINEZ, GARCIA, and three vehicle tracking warrants on vehicles used by LOPEZ. These efforts have produced some information for our investigation, including the general location vehicles possibly driven by LOPEZ, GARCIA, and some location information about MARIO. As noted above, this information has serious limitations and cannot fully accomplish the goals of this investigation.

82.	Text message search warrants are often limited in their usefulness, although they are occasionally very useful. Only certain providers can actually preserve and provide text messages in such a warrant, and even these providers can only provide text messages from a relatively narrow band of time preceding the requested warrant. The TARGET TELEPHONES do not use such a provider. As such, a text message search warrant for the TARGET TELEPHONES would yield no results. Text message search warrants also cannot provide the content of end-to-end encrypted messages. Law enforcement has sought text message search warrants on phones used by JOBANI, MARIO, and GARCIA. However, the information returned was not very useful. In the search warrant return on a phone used by JOBANI, there were very few text messages that

37

were not end-to-end encrypted and therefore readable. And the readable messages were not of the nature and quality that they provided any important information for the investigation. As such, this warrant did not fully accomplish the goals of this investigation, and did not include evidence of drug sales, reveal sources of supply, or the roles of co-conspirators. A text message search warrant return on MARIO PHONE 3, believed to be used by MARIO, similarly yielded little evidence and did not fully accomplish the goals of this investigation. However, this text message information, even when obtainable, is not in real-time, and does not allow law enforcement to utilize real-time information about DTO activities to make seizures, conduct surveillance, or understand who is meeting with whom and when. In two text message search warrant returns on a phone used by GARCIA, law enforcement received no content on one warrant return, and is currently reviewing the content of the second search warrant return, which appears limited to a handful of text messages. In sum, text messages search warrants have been and can be helpful in other investigations, but in this case have not been very helpful. Even if successful, text message search warrants cannot, by themselves, cannot ordinarily accomplish the goals of the investigation. In this case they have provided little assistance to investigators.

83.     Approximately 2 cellphones were seized in the Louisiana traffic stop described above. Law enforcement officers in Louisiana have offered to send the downloaded cellphone data to aid in this investigation, but they have not yet been received or reviewed by law enforcement officials in the Eastern District of Tennessee. Another 3 cellphones were seized in the Texas traffic stop described above, and the data was forwarded to law enforcement in this district. Law enforcement has begun the process of searching the 3 cellphones seized in Texas pursuant to a warrant, but the conversations largely appear to be in Spanish, and thus analysis of these phones will be slower than usual. While the search of these phones will likely yield important information useful to this

38

investigation, the search of these cellphones cannot, by itself, fully accomplish the goals of this investigation. For example, based on my training and experience, searches of cellphones do not fully identify the users of other phones communicating with the searched phones, and can only provide historical text messages and photographs. I also know that drug traffickers frequently do not like to speak openly in text messages, preferring calls or in-person meetings to discuss drug related business. Law enforcement also does not know if these cellphones will contain any information on key targets of this investigation, including LOPEZ and others. The information translated so far has not been very useful in the investigation of LOPEZ, and thus has failed to help fully accomplish the goals of this investigation. While there is evidence that suggests that the users of the seized cellphones were related to this investigation, the nature of those contacts are still largely unknown. Thus, while the search of cellphones used by possible co-conspirators can be a useful and important tool, I do not believe, based on my training and experience, that the search of the available cell phones in this case will be sufficient to accomplish the goals of this investigation.

84. Law enforcement has contemplated the use of search warrants to search physical locations associated with this DTO. Law enforcement likely has sufficient probable cause to search the LOPEZ HOUSE, which is where LOPEZ sleeps when he is in Eastern District of Tennessee. But at this time, I do not believe that a search warrant on that location can fully accomplish the goals of this investigation. Moreover, a search warrant executed on that location would likely lead to an end to our investigation because it will alert the members of the DTO that law enforcement is heavily investigating their activities. Law enforcement may have sufficient probable to search other locations, including a residence used by LOPEZ in Miami, and residences used by other members of the LOPEZ DTO. But law enforcement does not believe that search warrants on those

locations are worth the risk at this time. As noted above, once a search warrant is executed, the investigation is revealed and any potential co-conspirators may flee or destroy evidence, or otherwise change the nature of their operations to avoid further law enforcement investigation. As such, law enforcement has seriously considered the use of search warrants on physical locations such as the LOPEZ HOUSE, a house used by LOPEZ in Miami, and RAMIREZ's house, but does not believe that the rewards of such action currently outweighs the risks.

### Phone Toll Records

85.　　Phone toll records, analyzed pen register/trap and trace information, and other records have been analyzed in this investigation, and continue to be gathered for the TARGET TELEPHONES, and other phones used by DTO members. As noted above, toll records have been of some use in identifying numbers frequently contacted by the TARGET TELEPHONES and other DTO-associated phones. However, there are limitations to this investigative tool. These records serve only to confirm contacts between telephones. Pen register/trap and trace devices only capture the telephone numbers of individuals involved in the DTO.  And these pen register and toll records do not contain content of the conversations between the two parties, which is significant in the investigation of criminal conspiracies. In addition, these records do not provide the context of the conversation or the identities of the speakers. Such information is significant in the investigation of criminal conspiracies. It is known that some members of the DTO utilize communication devices not subscribed to or purchased in their names, which I believe is a method used to conceal their identities. As noted above, toll records and pen registers alone will not permit us to accomplish the goals of the investigation.

### Financial Investigation

86.     The financial investigation is only just beginning, although several subpoenas have been issued at this time for bank records, and for bank video related to suspected deposits and/or wire transfers. It is anticipated that through the use of law enforcement databases and bank record subpoenas, coupled with the sought electronic monitoring, the financial investigation will be advanced significantly. Preliminary financial inquiries have been performed on known subjects in the DTO but have yielded limited information that cannot, by itself, accomplish the goals of this investigation. A complete and thorough financial analysis will be performed as this investigation progresses and more information of the subjects' financial standing will be revealed. Based on my training and experience, Mexico supplied and cartel linked distribution organizations, like this one, infrequently use the formal banking system, which may limit our ability to uncover the breadth and depth of financial dealings by this organization without the use of a wiretap and other investigation methods. It is also apparent from this investigation that LOPEZ uses others to make deposits and wire money.  This is not uncommon for sophisticated drug traffickers, and makes building a prosecutable case or investigation  into a drug trafficking organization based on bank records and other financial investigation alone nearly impossible. As noted above, law enforcement has seized a large amount of cash from two vehicles case from suspected members of the DTO. These cash seizures, while helpful, have not and cannot accomplish the goals of this investigation on their own.

**Prison Efforts**

87.     RAMIREZ and TULIO were both detained by federal law enforcement officials on immigration violations following the traffic stop in Texas on or about August 26, 2020. Before TULIO was deported, law enforcement reviewed recorded jail calls by TULIO to MARIO. Similarly, before RAMIREZ was released from custody, law enforcement reviewed jail calls by

41

RAMIREZ to MARIO and others in the DTO. While these conversations were helpful in accomplishing the goals of this investigation, they did not provide sufficient evidence for prosecution, identify sources of supply, or otherwise reveal the full scope of the conspiracy or involved co-conspirators. Moreover, since these calls were placed from a federal detention center, the callers and recipients were aware that were recorded, and as such, the conversations were heavily coded and vague. They have also ceased since both RAMIREZ has been released and TULIO has been deported. As such, these calls alone, have not fully accomplished the goals of this investigation and cannot moving forward.

**Traffic Stops**

88. Law enforcement has utilized traffic stops and information gleaned from traffic stops to advance this investigation. NOLVIA, as discussed in detail above, provided information to law enforcement after a traffic stop. But as discussed above, this information alone cannot fully accomplish the goals of this investigation. For example, NOLVIA has provided no information as it relates to LOPEZ and appears to be in a close professional or personal relationship with LOPEZ.

89. Local law enforcement also stopped a vehicle in Louisiana, on or about June 15, 2020, that contained hidden cash, marijuana, and MARIO and RAMIREZ.[10] While the seizure of cash in a vehicle containing MARIO and RAMIREZ is helpful to accomplishing the goals of this investigation, there is no evidence of where that cash came from, and MARIO and RAMIREZ denied knowing that there was cash and marijuana hidden in the vehicle. Moreover this stop did not answer crucial questions asked by this investigation, such as who supplied the marijuana found in the car, where did the cash come from, what roles MARIO and RAMIREZ play in the DTO, the

[10] This stop was described in more detail in the fully incorporated prior affidavit.

identities of their co-conspirators, their relationship with LOPEZ, or how they are receiving and distributing cocaine and other drugs around the country, or where LOPEZ and others are keeping their supplies of drugs and cash proceeds. As such, this stop did not fully accomplish the goals of this investigation.

90.    The same is true for the August 26, 2020 traffic stop in Texas when a vehicle carrying approximately $101,000 was found hidden in a vehicle containing TULIO and RAMIREZ.[11] Both TULIO and RAMIREZ denied knowing about the hidden cash and thus we do not know the source of the cash hidden in the vehicle, where they were coming from, where they were going, who they were working with, their roles in the DTO, their source of supply, their customers, or any other information about the DTO or LOPEZ. As such, while this traffic stop was helpful in this investigation, it fell well short of fully accomplishing the goals of this investigation.

91.    On December 8, 2020, as detailed above, law enforcement stopped a vehicle that had been spotted traveling with LOPEZ (although LOPEZ was in another vehicle) from Florida, and traveling north from the Northern District of Georgia into Tennessee. That stop only yielded a small amount of marijuana and card skimming devices. This stop was not helpful in achieving the goals of the investigation.

92.    On December 12, 2020, as detailed above, law enforcement stopped a vehicle driven by CS3 after CS3 arranged to buy cocaine from LOPEZ. That stop, which yielded approximately 4 grams of suspected cocaine and approximately 2 pounds of marijuana, was certainly helpful in accomplishing the goals of this investigation. But thus far, all attempted traffic stops have not fully accomplished the goals of this investigation. Furthermore, each attempted traffic stop is

---

[11] This stop was described in more detail in the fully incorporated prior affidavit.

dangerous for law enforcement, and risks alerting members of the drug trafficking conspiracy that law enforcement is investigating their DTO.

## ELECTRONIC SURVILLANCE (TITLE IIIs)

93.     As noted above, law enforcement intercepted TARGET TELEPHONE 1, from on or about November 23, 2020 which did/will terminate on December 22, 2020.  During the interception of TARGET TELEPHONE 1, law enforcement learned a great deal about LOPEZ and his DTO.  For example, law enforcement has begun to identify the individuals that work with LOPEZ to distribute cocaine, marijuana, and other drugs.   During the interception over TARGET TELEPHONE 1, as detailed above, law enforcement learned that LOPEZ and his co-conspirators are selling illegal narcotics in the Eastern District of Tennessee. Law enforcement also learned that LOPEZ is likely buying and/or fixing cars in Miami, Florida, and then driving them to Tennessee where he then sells those cars, presumably for a profit.  But law enforcement also believes it is likely that LOPEZ uses those vehicles to transport illegal narcotics back from MIAMI, and may be purchasing those vehicles through the proceeds of his car sales. The intercepts over TARGET TELEPHONE 1 also captured LOPEZ speaking with a local government employee about acquiring titles for the vehicles he is purchasing in Miami.  Law enforcement believes that LOPEZ may be paying the government employee to falsify documents as a part of his efforts to launder proceeds from his drug sales, and with the proceeds of his drug sales.  In summary, and including the interceptions noted above in the affidavit, the interception of TARGET TELEPHONE 1 significantly advanced the investigation. But it did not fully accomplish the goals of the investigation.   Much remains to be learned and captured as evidence. For example, the investigation has not fully identified LOPEZ's suppliers, has not captured evidence sufficient to prosecute many of his co-conspirators, and has not yet revealed the full breadth of his illegal drug

44

trafficking and money laundering. While the interception over TARGET TELEPHONE 1 was a promising start to this investigation, law enforcement remains well short of fully accomplishing the goals of this investigation, and further wiretaps are required to move towards more fully accomplishing those goals.

## JURISDICTION

94.     Pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONES are used outside the territorial jurisdiction of this Court, interceptions may continue in the Eastern District of Tennessee, where communications over the TARGET TELEPHONES will first be heard and read, and minimized.

## MINIMIZATION

95.     All communications intercepted over the TARGET TELEPHONES will first be listened to, read, and minimized at a law enforcement facility in the EDTN. The requirements regarding the minimization of interception will be strictly followed. Before initial interception begins, a meeting will be held for all monitoring agents and civilian contract personnel wherein the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel not in attendance will be instructed on the requirements of minimization at a later time prior to their involvement in any monitoring activity. A memorandum regarding minimization will be provided to all monitoring agents/contract personnel as well as a copy of the Order authorizing interception. A copy of that Order and a minimization memorandum will remain posted at the listening site. Before agents/contract personnel begin to intercept communications, the agents/contract personnel will be required to sign a form indicating that the agents/contract personnel have read this Affidavit, the Order authorizing interception, and the minimization memorandum and that the agent/contract personnel are familiar with the contents of the Order and

45

will intercept wire and electronic communications in compliance with that Order. Special attention will be paid to minimizing privileged communications, including privilege marital communications, if applicable.

96.    All monitoring of wire and electronic communications will be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

97.    In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

98.    Based on my experience and that of other agents who have monitored and supervised wire and electronic interceptions, I believe that many drug related conversations may be part of an

otherwise innocent conversation. Thus, lengthy conversations that appear to be non-pertinent will be periodically monitored to determine if the conversation has become criminal in nature.

99.     As officers, deputies, investigators, and agents from state and local agencies may participate in this investigation, and their further participation would aid this investigation, it is requested that they be authorized to assist the agents in conducting this electronic surveillance, as provided by 18 U.S.C. §§ 2517(1) and 2517(2). In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

100.    All intercepted wire and electronic communications will be recorded and all recordings will be securely preserved. Computerized logs will be prepared regarding the date, time of calls/communications, the parties involved, the subject of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the Court on or about the fifteenth (15th) day following the commencement of interception, pursuant to the Order. Particular emphasis will be placed on reporting minimization efforts as well as the need for the wire intercepts to the Court.

101.    All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code. Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and

secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

102.    Electronic communications over the TARGET TELEPHONES will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream.  That packet data stream, pursuant to CALEA, will be delivered to the FBI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone.  Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through the FBI's wire communications collection system and minimized in real-time.  The packet data, including the copies of voice calls, cannot be minimized in real-time.  Therefore, the FBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls from being intercepted in the packet data stream by filtering them out of the packet data stream before they are recorded.  Those voice

48

calls in the packet data stream will not be "intercepted" within the meaning of 18 U.S.C. § 2510(4) (defining "intercept" as the "aural or other acquisition" of the contents of a communications) (emphasis added). However, on rare occasions, a voice call might not be filtered out of the packet data stream due to circumstances including unanticipated technology changes by the service provider or imperfect operation of the filter program. If a voice call is not filtered out and is recorded in the FBI's electronic communications collection system, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and the FBI will preserve and seal such communications in the same manner as other intercepted electronic communications.

103. Finally, IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the resulting Order and Orders to the Service Provider, and all reports submitted pursuant to this Order be sealed until further Order of the Court.

_Steffan Hollifield_
STEFFAN HOLLIFIELD
TFO, FBI

Subscribed and sworn to before me on this December 22d, 2020.

_Thomas A. Varlan_
HON. THOMAS A. VARLAN
United States District Judge
Eastern District of Tennessee

49